23488

SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, Respondent v. Steven W. HAMM, The South Carolina Department of Consumer Affairs, and the Public Service Commission of South Carolina, Defendants, of whom Steven W. Hamm, Consumer Advocate for the State of South Carolina is Appellant.

(409 S.E. (2d) 775)

Supreme Court

*Steven W. Hamm, Raymon E. Lark, Jr.*, and *Elliott F. Elam, Jr.*, all of *S.C. Dept. of Consumer Affairs*, Columbia, *for appellant.*

*Fred A. Walters*, of *Southern Bell Tel. and Tel. Co.*, and *A. Camden Lewis* and *Costa M. Pleicones*, of *Lewis, Babcock, Pleicones & Hawkins*, Columbia, *for respondent.*

*Marsha A.* of *Ward, S.C. Public Service Com'n*, Columbia, *for defendants.*

Heard May 20, 1991; Decided Oct. 7, 1991.

Rehearing Denied, Oct. 31, 1991.

TOAL, Justice:

Consumer Advocate Steven W. Hamm (Hamm) appeals the circuit court's ruling that Southern Bell's Caller ID service does not violate either S.C. Code Ann. § 17-29-20 (1991 Supp.)[1] (a part of South Carolina's Trap and Trace Law) or the Constitutions of the United States and State of South Carolina. We affirm.

## FACTS

Caller ID is an optional service by which Southern Bell customers may purchase a device for their telephone that, upon

---

[1] Section 17-29-20 provides that no person can install a trap and trace device on a telephone unless a provider of the service uses the device (1) relating to the operation, maintenance, and testing of a wire or electronic service or to the protection of the rights of the property of the provider, or to the protection of users of that service from abuse of service or unlawful use of service; (2) to record the fact that a wire or electronic communication was initiated or completed in order to protect the provider, another provider, or a user from fraudulent, unlawful or abusive use of service; or (3) where the consent of the user has been obtained. A trap and trace device, as defined by § 17-29-10, is a device which captures incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted.

subscription to the service, will reveal the telephone numbers of incoming calls as soon as the phone begins to ring. The device may also be programmed to store a list of numbers that have attempted to connect with a subscriber's telephone number.

On December 6, 1989, Southern Bell filed an application with the South Carolina Public Service Commission (PSC) for revisions to its General Subscriber Tariff for the purpose of obtaining permission to offer the service. On December 15, 1989, Hamm moved to intervene and was made a party.

On March 1, 1990, Hamm moved for a continuance in order to require Southern Bell to conduct a customer survey and conform its proposed revisions to § 17-29-20, alleging that the service as proposed would violate § 17-29-20 unless all callers had the option to block the display of their numbers. The PSC denied the motion.

A public hearing was held on March 14, 1990. On April 19, 1990, the PSC issued Order No. 90-428, approving the tariff for provision of Caller ID. The Order permitted some law enforcement agencies and crisis centers to block reception of their numbers by service subscribers.

On April 30, 1990, Hamm filed a Petition for Rehearing and Reconsideration, alleging that the PSC had failed to rule on whether Caller ID violated § 17-29-20. In response to the motion, the PSC issued Order 90-530 in which it asserted that it was not the proper body to decide that issue.

On May 30, 1990, Hamm filed a Motion for Stay of Order in which he asked that the implementation of the service be delayed. The PSC, by Order dated June 7, 1990, granted the motion until the legality of the service could be established in the proper forum. To that end, Southern Bell filed the complaint in this action, seeking declaratory judgment on the issue whether Caller ID violated § 17-29-20 and the United States and South Carolina Constitutions.

A nonjury trial was held on September 7, 1990. The trial judge held that Caller ID does not violate § 17-29-20 or any federal or state constitutional provisions. This appeal ensued. We affirm the trial judge's excellent order and incorporate portions of it into this opinion.

## LAW/ANALYSIS

I.  Does Caller ID violate § 17-29-20?

The trial judge found that Caller ID does not violate § 17-29-20 because it falls under the exclusions set forth in the statute. We agree.

Section 17-29-20(B)(1) and (2) provides that a person may install a trap and trace device if it is used to protect the user from abuse of or unlawful use of telephone service. Based upon the evidence in the record, there can be no doubt that Caller ID service is designed to protect the utility's subscribers from abusive or unlawful telephone calls. Similarly, the service will aid a user of the service from being subjected to fraudulent, unlawful or abusive use of telephone service.

Even if Caller ID service does not fall within the exceptions contained in § 17-29-20(B)(1) or (2), Subsection (3) of § 17-29-20(B) exempts the use of trap and trace devices where the consent of the user of the service has been obtained. In the case of Caller ID, the "user" would be the subscriber to the service.

Hamm argues that our Trap and Trace Statute requires the consent of both the calling and called parties and cites a recent Pennsylvania Commonwealth Court decision interpreting a purportedly identical statutory scheme. *See, Barasch v. Pennsylvania Public Utility Commission*, 133 Pa. Cmwlth. 285, 576 A. (2d) 79 (Pa. 1989). *Barasch*, however, can be distinguished from this case because Pennsylvania's Wiretapping Act is different from South Carolina's Trap and Trace Law in two important ways.

First, 18 Pa. C.S.A. § 5704(4) provides an exception to interception of wire communications only ". . . where *all* parties to the communication have given prior consent to such interception." (emphasis added). No parallel provision is to be found in any South Carolina statute. Rather, § 17-29-20(B)(3) provides that the use of a trap and trace device is permitted with the consent of the user. The choice of the singular term "user," must, in this context, be understood to refer to the consent of the person being called, *i.e.*, the subscriber. Nowhere in the

South Carolina Act is the term "all parties" utilized by the General Assembly so as to require both parties to consent.[2]

Second, Pennsylvania has an extensive statutory scheme from which it was necessary for the Pennsylvania legislature to specifically exempt police and emergency communications (*i.e.*, 911/E911 services) as an exception to the "all party consent" rule. 18 Pa. C.S.A. § 5704(3). Again, the South Carolina General Assembly did *not* include such a provision when it enacted this statute. This is significant because, since January 1, 1984, Southern Bell has provided a "911" emergency service to its customers. When the General Assembly enacted the Trap and Trace Law, it did so knowing of the existence of that 911 service. Yet, it did not deem it necessary to provide an express exception in that statute, as had the Pennsylvania Legislature.

Indeed, if Hamm's argument were carried to its logical conclusion, "911" emergency service, which technically functions the same as Caller ID, would violate South Carolina's trap and trace law. In both services, the calling party's telephone number is passed to a third party without his or her prior express consent. The absence of any "911" related exception in the South Carolina Act evidences further that the South Carolina Legislature did not intend for tariffed services of a utility to be violative of the South Carolina Trap and Trace Act. A careful reading of *Barasch* clearly reveals the significant differences between the Pennsylvania statutory scheme and the South Carolina statute. This Court therefore rejects Hamm's contention that Southern Bell's Caller ID service as approved by the PSC violates § 17-29-20.

Hamm argues that such a construction would render § 17-29-20 meaningless. This is not correct. Reference to the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510, which mandated passage of South Carolina's statute, and to

---

[2] *See also, Baumrind v. Ewing,* 276 S.C. 350, 279 S.E. (2d) 359, *cert. denied,* 454 U.S. 1092, 102 S. Ct. 657, 70 L. Ed. (2d) 630 (1981), where the South Carolina Supreme Court approved the use in evidence of recordings of conversations made by a telephone subscriber who wiretapped his own telephone. The Court noted that no third party was involved in Baumrind's wiretapping, implying that had a third party done so, the Court would have held such action illegal under the Omnibus Crime Control and Safe Streets Act. *Id.,* 279 S.E. (2d) at 360. Sections 17-29-10 to 50 prohibit different wiretapping conduct than does the federal statute, but the Court's antipathy for third-party intrusion is compelling.

reports issued by the Judiciary Committees or both the House (H. Rep. 99-647) and Senate (S. Rep. 99-541), U.S. Code Cong. & Admin. News 1986, p. 3555 indicates that the purpose behind the federal law was to increase privacy protections afforded to citizens. The Electronic Communications Privacy Act was passed to extend federal and state statutory protection to unwarranted intrusion through the use of pen registers and trap and trace devices because of the United States Supreme Court's holdings in *Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. (2d) 220 (1979), and *Rathbun v. United States*, 355 U.S. 107, 78 S. Ct. 161, 2 L. Ed. (2d) 134 (1957), that those devices do not violate the Fourth Amendment and could be installed by a law enforcement agency without a warrant.

It is clear that what our legislature sought to do, in enacting §§ 17-29-10 to 50, was to protect the citizens of South Carolina from abusive, unauthorized and unwarranted third party or governmental intrusion by prohibiting the unauthorized use by such parties of trap and trace or pen register devices without first obtaining a court order. The use of Caller ID does not contravene that goal.

## II. Is Caller ID Unconstitutional?

Hamm argues that the trial court erred in rendering judgment on the constitutional issue because such an analysis was "purely advisory" in light of the holding that Caller ID did not violate § 17-29-20. We disagree.

The trial court found that analysis of the constitutional issues was proper because "Southern Bell's prayer for relief asked the Court to declare Caller ID service to be in concert with the South Carolina and United States Constitutions. . . ." In paragraph 25 of its Second Amended Complaint, Southern Bell requested the trial court to "inquire into the matters alleged above and declare Caller ID to be legal, and in compliance with *S.C. Code* Sections 17-29-10, *et seq.* and the South Carolina and United States Constitutions." (emphasis added). Thus, we find that the trial court properly considered the issue. In any event, since this issue would be raised to the Court at some future time and since both parties have fully briefed the issue, we find that it is in the interest of judicial economy to decide the matter now.

Before deciding whether the service is violative of constitutional rights of privacy, however, we must first determine that the actions of the South Carolina PSC rose to the level of "state action" as, absent that involvement, the constitutional right to privacy does not attach to the Caller ID service. The leading case on the issue of state action and public utility regulation is *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S. Ct. 449, 42 L. Ed. (2d) 477 (1974). As explained by Justice Rehnquist,

> The mere fact that a business is subject to state regulation does not by itself convert its action into that of the state for purposes of the Fourteenth Amendment. Nor does the fact that regulation is extensive and detailed, as in the case of most public utilities, do so.

*Id.*, at 350, 95 S. Ct. at 453. Similarly, in the case of *Blum v. Yaretsky*, 457 U.S. 991, 102 S. Ct. 2777, 73 L. Ed. (2d) 534 (1982), the Supreme Court again addressed when state action arises:

> There must be a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself . . . The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains.

*Id.*, at 1004, 102 S. Ct. at 2786.

In the instant matter, the PSC's involvement has been limited to the standard approval process that Southern Bell must follow regarding the offering of new services. In that regard both Title 58, Chapter 9, and Title 1, Chapter 23 (the Administrative Procedures Act), of the *Code* govern Southern Bell's conduct as well as that of the PSC. It is clear upon a review of the record that Southern Bell sought the PSC's approval of Caller ID service in the form of revision of its general tariff as required by statute. S.C. Code Ann. § 58-9-520 (Supp. 1990). The PSC held a public hearing and issued an order pursuant to § 58-9-540. Although the application for revision and the hearing were required by state law, in no way could the PSC be said to be responsible for or to have coerced the institution

of the service.

The PSC's only involvement in Southern Bell's proposed offering of Caller ID service was its sitting as a quasi-judicial/executive entity under the APA. Such conduct simply does not rise to the necessary level of involvement to result in action by the State. We find, therefore, that no state action exists. Accordingly, further analysis is not necessary; however, in the interest of settling this matter with finality, analysis of a citizen's right to privacy is proper.

Hamm contends that the proposed service is an invasion of the caller's right to privacy as protected by the fourteenth amendment of the United States Constitution and Article I, § 10, of the South Carolina Constitution. Heretofore, the United States Supreme Court has limited governmental intrusion into such areas as speech, association, and marriage, sex, family, and reproduction.[3] In cases in which a violation of privacy or some other fundamental right has been alleged, this Court must balance the alleged privacy rights against legitimate interests served by the challenged conduct. *Whalen v. Roe*, 429 U.S. 589, 97 S. Ct. 869, 51 L. Ed. (2d) 64 (1977). Thus, the caller's interest in not revealing his or her telephone number must be weighed against the interest of the called party in not receiving harassing, fraudulent, unlawful, or abusive calls.

As the trial judge noted, the interests served by Caller ID service as determined by the PSC are substantial. The record shows that Caller ID would assist in detecting and deterring fraudulent, unlawful, harassing, and obscene telephone calls. It would aid the hearing impaired in recognizing whether or not to utilize necessary mechanical devices to accept a call. It would serve as a surrogate for "911" services in those counties where that service is not available. It would assist law enforcement and public officials in preventing damage to property and saving lives by reducing the number of bomb threats as shown by actual experience in other jurisdictions.

In contrast, the interests of the called party are largely un-

---

[3] *See, e.g., Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. (2d) 510 (1961); *Loving v. Virginia*, 388 U.S. 1, 87 S. Ct. 1817, 18 L. Ed. (2d) 1010 (1967); *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. (2d) 147 (1973). It should be noted, however, that the high court has never recognized a general right to privacy.

determined. The United States Supreme Court has previously held that callers do not have an expectation of privacy in the numbers they dial. In *Smith v. Maryland, supra,* the Supreme Court stated:

> Telephone users, in sum, typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes. Although subjective expectations cannot be scientifically gauged, it is too much to believe that telephone subscribers harbor any general expectation that the numbers they dial will remain secret . . . [E]ven if petitioner did harbor some subjective expectation that the phone numbers he dialed would remain private, this expectation is not "one that society is prepared to recognize as reasonable." *Katz v. United States,* 389 U.S. [347] at 361, 88 S. Ct. 507 [at 516], 19 L. Ed. (2d) 576 (1967).

In light of the holding in *Smith,* we cannot hold that the telephone number of the equipment from which a call has been placed is entitled to more privacy than the telephone numbers called by someone. The telephone number from which a call is placed, like the phone numbers of the calls placed, is numerical information passed through the telephone network, voluntarily transmitted as a result of call placement. Caller ID service simply does not violate any right that rises to the level of constitutional protection. No fundamental interest is involved in the anonymity of a telephone number, particularly when the ownership thereof is vested in the telephone utility, not the subscriber.[4] This conclusion is in concert with the U.S. Supreme Court's discussion in *Rowan v. United States Post Office Department,* 397 U.S. 728, 90 S. Ct. 1484, 25 L. Ed. (2d) 736 (1969):

> . . . nothing in the Constitution compels us to listen to or view any unwanted communication . . . the ancient view

---

[4] Southern Bell's General Subscriber Service Tariff § A2.3.12 states that "[T]elephone numbers are the property of the Company . . . [t]he subscriber has no property right to the telephone number or any other call number designation. . . ."

that "a man's home is his castle" into which "not even a king may enter" has lost none of its vitality, and none of the recognized exceptions includes any right to communicate offensively with another.

Hamm argues that these interests could be served by less intrusive means. However, this argument was neither raised nor ruled on below. In any event, we find that all of these interests could not be served by any of the caller services now in existence. We conclude that the service does not violate any state or federal constitutional rights to privacy. In light of our disposition of these issues, we do not find it necessary to reach the parties' remaining exceptions. Based on the findings and conclusions set forth in the foregoing analysis, the trial court is

Affirmed.

GREGORY, C.J., HARWELL and FINNEY, JJ., and JOHN P. GARDNER, Acting Associate Justice, concur.